**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | | |
|---|---|---|
| SOUTHEAST TOWERS, LLC, and | : | |
| NEW CINGULAR WIRELESS PCS, | : | |
| LLC, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 2:06-CV-0172-RWS |
| | : | |
| PICKENS COUNTY, GEORGIA, and | : | |
| the PICKENS COUNTY | : | |
| COMMISSIONER, | : | |
| | : | |
| Defendants. | : | |

## ORDER

This case comes before the Court for consideration of Plaintiffs' Appeal

[15] under the Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 151 et

seq., in which Plaintiffs seek an injunction requiring Pickens County to issue a

building permit authorizing Plaintiffs to construct a wireless

telecommunications tower.  For the reasons provided below, Plaintiffs' appeal

is **DENIED**.

### Background

Plaintiffs Southeast Towers, LLC, and New Cingular Wireless PCS, LLC

(hereinafter collectively referred to as "SE Towers"), are wireless telecommunications providers authorized by the Federal Communications Commission ("FCC") to operate a personal wireless communications system throughout the State of Georgia.  SE Towers, which is currently in the process of expanding its network, sought to locate a telecommunications antenna in Pickens County, Georgia, to increase its coverage area.  After investigating various sites, SE Towers' engineers determined that a 250-foot tower was needed at or near a 19.7-acre tract of land located at the intersection of Highway 53 East and Parker Road (the "Property") in Pickens County.  SE Towers negotiated an Option and Ground Lease Agreement with the Property's owner, Raymond Edwards, and then sought the requisite governmental permits.

The proposed site of the tower is located in close proximity to the Village of Tate, an unincorporated town in the foothills of the Appalachian Mountains known for its abundant marble quarries.  Besides its scenic beauty, Tate is home to various historic sites that are listed in the National Register of Historic Places.  At its closest boundary, the Property is approximately 1100 feet from structures within the Tate Historic District, which comprises various older buildings and structures associated with a local quarrying business formed in the early 1900s by Samuel Tate.  Tate's grandfather pioneered the town's

2

marble-quarrying operation in the 1830s and, by those efforts, eventually became the town's namesake.  The Tate House is farther away, which Samuel Tate constructed in 1923 almost entirely out of the bright pink marble for which Georgia's quarries are known.[1]  These are among 111 historic structures, including shotgun houses, pyramidal cottages, and Craftsman-style bungalows constructed in the mid- to late-eighteenth century, two Gothic Revival-style Methodist churches completed in 1887, and the Tate High School built entirely out of white marble in 1928.

In order to erect a tower on the site, SE Towers was obligated to obtain permits from the FCC, the Federal Aviation Administration, and the Pickens County zoning authority.  In April and May of 2006, SE Towers obtained the approval of the FAA and the FCC for the placement of its cell tower.  Because of its potential visual impact on the Tate Historic District, SE Towers was required under the National Historic Preservation Act of 1966, 16 U.S.C. § 470, et seq. ("NHPA"), to submit an additional application to Georgia's State Historic Preservation Officer ("SHPO") concerning its compliance with the

_____

[1] Mimi Jo Butler, "Marble Industry," in NEW GEORGIA ENCYCLOPEDIA, available at http://www.georgiaencyclopedia.org/nge/Article.jsp?id=h-1168 (last accessed May 5, 2008); see also Luke E. Tate, History of Pickens County (1935; reprint, Spartanburg, S.C.: Reprint Co., 1978).

goals of national historical preservation.[2]  SE Towers hired a professional

consultant, Environmental Corporation of America ("ECA"), to prepare a "New

Tower Submission Packet," also referred to as an "FCC Form 620," which

requires the applicant to disclose the visual impact of a proposed tower on any

"historic property," including those listed in the National Register of Historic

Places.  See generally Nationwide Programmatic Agreement for Review of

Effects on Historic Properties for Certain Undertakings Approved by the FCC ,

App. B to 47 C.F.R. § 1.1301, et seq., § II.A.9.  Based on its own review, ECA

determined that there would be no view of the proposed cell tower from the

---

[2] The NHPA provides a regulatory framework for federal and state agencies, local governments, and private organizations to implement a national historic preservation plan.  Among other things, the NHPA governs the manner in which federal agencies, such as the FCC, must act in accordance with federal preservation efforts.  As it pertains in this case, the NHPA requires the FCC, before granting any federal license, to "take into account the effect of the [license] on any district, site, building, structure, or object that is included in . . . the National Register."  16 U.S.C. § 470f.  It must also "afford the Advisory Council on Historic Preservation," created by the FHCA as a state-by-state mechanism to enforce the NHPA, "a reasonable opportunity to comment with regard to such undertaking."  16 U.S.C. § 470f.

Section 110 of the NHPA requires each federal agency to establish a preservation program for the protection of historic properties which "shall ensure . . . that the preservation of properties not under the jurisdiction or control of the agency, but subject to be potentially affected by agency actions[,] are given full consideration in planning."  16 U.S.C. § 470h-2(a)(2)(C).  It also requires "that the agency's preservation-related activities are carried out in consultation with . . . local agencies . . . carrying out historic preservation planning activities, and with the private sector."  Id. §§ 470h-2(a)(2)(D).  To achieve this cooperation, the Section 110 of the NHPA requires agency heads to appoint a state historic preservation officer ("SHPO"), who is responsible for coordinating that agency's activities under the NHPA.  Id. § 470h-2(c).

Historic District or any other historic place within Tate.  Thus, it represented in its FCC Form 620 that the proposed tower would have "No Effect" on any Historic Property in the area.  On June 2, 2006, the SHOP confirmed that it received the FCC Form 620 and allowed a thirty-day period to elapse without comment, thus granting SE Towers the necessary federal authorization under the NHPA.

SE Towers also sought permission from the Pickens County Planning and Development Office for the erection of its proposed cell tower.   Under the Pickens County zoning ordinances, a permit is required for the construction of a telecommunications tower or antenna in excess of 70 feet in height.  Pickens County Ordinances ¶ 66-74.  On April 27, 2006, SE Towers submitted an application for a permit to construct a 250-foot, self-supporting, lattice-style telecommunications tower on the leased portion of the Property (the "Application").

On May 3, 2006, the Marble Valley Historical Society, Inc. ("Marble Valley") wrote the ECA to object to the granting of a permit at the location proposed by SE Towers.  In its letter, Marble Valley noted that, in the past, other companies seeking permits to erect towers had conducted more extensive testing to ascertain whether the tower would impact the "historical ambience"

of the Village of Tate.  It urged that the tower proposed by SE Towers was even more invasive than cell towers proposed in the past and no balloon tests had yet been conducted to determine the visual impact of the proposed tower.  Marble Valley also contended that the proposed tower "[would] create a detrimental view of the historic district and impact the long range plans to preserve the original character of the Georgia Marble Company village with many homes over 75 years old."  (Ex. B to Pl.'s Compl. at 00007-08.)  Its letter was forwarded to the Pickens County Planning and Development Office.

The Application was presented to the Pickens County Planning Commission on June 12, 2006.  Two representatives of Marble Valley, Don Wells and Mimi Jo Butler, attended the meeting and voiced their concerns about the visual impact of the tower on the Tate Historic District, urging the Commission to require further testing.  Following a hearing, the Planning Commission voted to require a "balloon test" to consider the visual impact of the tower on the Historic District.  SE Towers' consultant, the ECA, conducted a balloon test on June 23, 2006, in which photographs were taken in and around the proposed tower location and the Tate Historic District.  As it did before, ECA concluded that there were "no views" of the proposed tower and antenna facility capable of resulting in an adverse visual effect on nearby historic sites

6

because of "intervening treelines, vegetation and variable topography . . . ."
(Ex. B to Pl.'s Compl. at 00015.)   After considering the results of the balloon
test, the Planning Commission preliminarily approved the Application on July
10, 2006, subject to a specially scheduled public hearing.

On August 14, 2006, the Planning Commission held a public hearing, in
which representatives of SE Towers and ECA advanced their view that the
proposed cell tower would have no material effect on the views of the Historic
District.  Various community members, however, attended the hearing to
oppose the permit.  Mr. Wells made a presentation on behalf of Marble Valley,
the Marble Valley Friends, Inc., the State Community Association, and the
Citizens Advocating Responsible Development.  Mr. Wells urged the
Commission to deny the permit because the proposed cell tower would have a
direct and adverse visual impact on the views from at least six homes within the
Historic District.  He supplemented his testimony with photographs taken on
the day the balloon test was conducted from the locations of the six historic
structures.  Each photograph demonstrated that the balloon (and thus the
proposed cell tower) would be directly visible from structures within the Tate
Historic District.  (Ex. D to Pl.'s Compl. at 5-9.)  Moreover, Mr. Wells testified
that the cell tower would have a greater impact and be seen from additional sites

7

within the Tate Historic District during the Fall and Winter months when the trees and vegetation were less visible and provided less obstructed view of the skyline.

Following Mr. Wells' testimony, eight other citizens voiced their opposition to the erection of the cell tower at the location requested.  Although some individuals simply voiced displeasure with the aesthetics of the proposed cell tower in conjunction with the scenic views of Pickens County, others testified specifically concerning the aesthetic effect of the tower on their own properties within the Tate Historic District, and at least two of those citizens objected to the effect of the flashing red light proposed to be placed on the 250-foot cell tower in compliance with FAA regulations.  (Id. at 10-12.)  Another member of the community, Jim Russell, testified that he was involved in the cell phone tower business and explained that less intrusive alternatives, such as a slimline pole or a shorter tower, could accomplish the goals of SE Towers with a less dramatic adverse visual impact.

Following the public hearing, the Planning Commission took no vote on the permit, electing instead to submit a report to the Commissioner for his decision.  By a four-page letter dated October 13, 2006, the Commissioner denied the permit, stating that he resolved the conflict concerning whether the

8

proposed cell phone tower would have a material visual impact on the Historic

District in favor of the individuals and organizations opposing the permit.  He

disagreed with the conclusion of the SHPO, and concluded that the application

to the SHPO did not accurately characterize the impact of the proposed tower

on the Historic District.  Thus, he concluded that the application did not meet

Section 66-76 of the Pickens County Ordinance, which requires that "All

towers must meet or exceed current standards and regulation of the FAA, the

FCC, and any other agency of the federal government with the authority to

regulate towers and antennae."  (Ex. E. to Pl.'s Compl. at 2-3.)[3]  His written

---

[3] The Commissioner wrote, in pertinent part, as follows:

Mr. Wells' testimony established his experience and expertise with issues involving the Tate Historic District, the local significance of the Tate Historic District, as well as how the visual impact of a 250 - 255 foot cell tower on this proposed site had the possibility of materially diminishing the visual integrity of the Historic District.  His testimony also included several pictures taken on June 23rd during the balloon test.  These pictures showed that the cell tower would be visible from at least six historic sites within Tate, and they were used by Mr. Wells to establish his opinion that the visual impact of a cell tower on this proposed site would be of a significant magnitude which would materially diminish the visual integrity of the Historic District. . . .

Section 66-76 of our Code of Ordinances states, "All towers must meet or exceed current standards and regulations of the FAA, the FCC, and any other agency of the federal government with the authority to regulate towers and antennae." . . . . I do not believe that the issuance of a permit by the FCC for the construction of a cell tower is conclusive proof that "all standards and regulations" of the FCC have been met.  I also do not believe

decision also referenced one of the stated goals of Section 66-75 of the Pickens County Ordinances, which was "to protect those geographic areas containing visually significant or unique natural features."  (Id.)

Within 30 days of the date of the denial letter, SE Towers initiated this action, alleging inter alia that the Pickens County Commissioner's denial of its Application violates the Telecommunications Act of 1996 and requesting either mandamus or injunctive relief requiring the City to approve its Application and issue a building permit for its proposed telecommunications tower.  The Court turns now to resolve SE Towers' Appeal.

---

that the issuance of the FCC permit precludes my office from reviewing whether or not "all standards and regulations" of the FCC have been met. . . . [M]y interpretation of Section 66-76 [complies] with the spirit of the Federal Telecommunications Act which delegates decisions concerning the location of cell towers to the local government as well as the stated purposes of the Pickens County Ordinance for Telecommunications Towers and Associated Structures, as expressed in Section 66-75, especially "to protect those geographic areas containing visually significant or unique natural features."

. . . .

Therefore, in reviewing whether "all standards and regulations" of the FCC have been met, I find that Southeast Tower, LLC, did not accurately identify the material effects the location of a 250-foot cell tower at the intersection of Highway 53 East and Parker Road would have on the Tate Historic District and, thus, deny the permit.

(Ex. E. to Pl.'s Compl. at 2-4.)

## Discussion

In its Appeal, SE Towers asserts that the Commissioner's decision to deny its Application for a permit violates the Telecommunications Act of 1996 ("TCA"), codified at 47 U.S.C. § 151 et seq., for two reasons. First, SE Towers contends that the Commissioner did not have the authority to deny the application based upon the reasons he provided in his written letter of October 13, 2006. Second, SE Towers argues that the Commissioner's decision was not supported by substantial evidence contained in a written record as required by 47 U.S.C. § 332(c)(7)(B)(iii). After considering the standard of review under the TCA, the Court takes up each of SE Towers' arguments in turn.

### A.    The Telecommunications Act of 1996

The TCA "is an omnibus overhaul of the federal regulation of communications companies," Cellular Telephone Co. v. Town of Oyster Bay, 166 F.3d 490, 493 (2d Cir. 1999), intended, in part, "to promote competition and higher quality in American telecommunications services and 'to encourage the rapid deployment of new telecommunications technologies.'" Michael Linet, Inc. v. Village of Wellington, 408 F.3d 757, 761 (11th Cir. 2005) (quoting City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115, 125 S. Ct. 1453, 161 L. Ed. 2d 316 (2005)). "With respect to the construction of

11

telecommunications facilities, Congress recognized zoning decisions by state and local governments had created an inconsistent array of requirements, which inhibited both the deployment of personal communications services and the rebuilding of a digital technology-based cellular telecommunications network." Preferred Sites, LLC v. Troup County, 296 F.3d 1210, 1214 (11th Cir. 2002). Congress also recognized, however, that "'there are legitimate State and local concerns involved in regulating the siting of [communications facilities].'" Id. (quoting H.R. Rep. No. 104-204 (1996), at 207-08, reprinted in 1996 U.S.C.C.A.N. 124, 222)).

Congress sought to balance these concerns by expressly preserving in the TCA the traditional authority enjoyed by state and local governments to regulate land use and zoning, while imposing certain "substantive and procedural limitations upon the authority of state or local governments to regulate the construction of facilities for wireless communication services." Preferred Sites, 296 F.3d at 1214-15; see also Southwestern Bell Mobile Systems, Inc. v. Todd, 244 F.3d 51, 57 (1st Cir. 2001) (explaining that the procedural and substantive limitations of the TCA "subject local governments to an outer limit upon their ability to regulate personal wireless services land use issues" (internal quotations and alterations omitted)).  "The TCA thus

12

strikes a balance between 'two competing aims—to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers.'" Omnipoint Commc'ns, Inc. v. City of White Plains, 430 F.3d 529, 531 (2d Cir. 2005) (quoting Town of Amherst, N.H. v. Omnipoint Commc'ns, 173 F.3d 9, 13 (1st Cir. 1999)).

Under the TCA, local governments may not unreasonably discriminate among providers of functionally equivalent services," § 332(c)(7)(B)(i)(I), take actions that "prohibit or have the effect of prohibiting the provision of personal wireless services," § 332(c)(7)(B)(i)(II), or limit the placement of wireless facilities "on the basis of the environmental effects of radio frequency emissions," § 332(c)(7)(B)(iv).  They must act on requests for authorization to locate wireless facilities "within a reasonable period of time," § 332(c)(7)(B)(ii), and each decision denying such a request must "be in writing and supported by substantial evidence contained in a written record," § 332(c)(7)(B)(iii).  City of Rancho Palos Verdes, 544 U.S. at 116.

For purposes of its appeal, SE Towers limits its challenge to the substantial-evidence requirement of the TCA.  SE Towers, as the party seeking to overturn the Commissioner's decision, bears the burden of proving that it is not supported by substantial evidence.  Michael Linet, 408 F.3d at 762;

13

American Tower, 295 F.3d at 1207.  "[T]he 'substantial evidence' standard is the traditional substantial evidence standard used by courts to review agency decisions."  Michael Linet, 408 F.3d at 762.  Substantial evidence means "'such relevant evidence which a reasonable mind might accept as adequate to support a conclusion.'"  American Tower LP v. City of Huntsville, 295 F.3d 1203, 1207 (11th Cir. 2002) (quoting AT & T Wireless PCS, Inc. v. City Council of Virginia Beach, 155 F.3d 423, 430 (4th Cir. 1998)).  "'It requires more than a mere scintilla but less than a preponderance.'"  Id. (quoting 360 degree Communications, 211 F.3d at 83).  In conducting a substantial evidence review, the Court is required to consider the record in its entirety, including evidence unfavorable to the administrative decision.  See Preferred Sites, 296 F.3d at 1218.  A reviewing court cannot substitute its own judgment for that of the local board, and must uphold the zoning decision if it is supported by substantial evidence whether or not that court would reach the same conclusion in the first instance.  Id.

> B.     **The Commissioner Had the Authority to Deny the Permit.**

SE Towers first argues that the Pickens County Commissioner did not have the authority to deny the permit based upon the reasons provided in his

14

written decision.  In particular, SE Towers contends that Pickens County

Ordinance Section 66-76 does not grant the Commissioner the authority to deny

the Application "simply because he disagrees with the determination made by

the Georgia SHPO as to Plaintiffs' compliance with the FCC requirements

relating to the potential impact of the tower on the Historic District."  (Pl.'s

Reply at 5.)  In addition, SE Towers contends that Section 66-75 does not

authorize the Commissioner to deny a permit based upon an adverse aesthetic or

visual impact to a federally-protected historic site.  For the reasons that follow,

the Court disagrees.

The Georgia Zoning Procedures Law, O.C.G.A. § 36-66-1, et seq.,

authorizes local governments to exercise zoning authority and promulgate

standards to govern local zoning decisions.  O.C.G.A. § 26-66-2.  It also

requires local governments to adopt standards governing the exercise of their

zoning power.  O.C.G.A. § 26-66-5.  Pursuant to that authority, local

governments may "include *any factors* which the local government finds

relevant in balancing the interest in promoting the public health, safety,

morality, or general welfare against the right to the unrestricted use of

property."  O.C.G.A. § 26-66-5 (b) (emphasis added).  "Even zoning based

merely on aesthetic interests is a reasonable and proper exercise of the city's

police power."  Corey Outdoor Advertising, Inc. v. Bd. of Zoning Adjustments of the City of Atlanta, 254 Ga. 221, 224 (1985).

Pickens County has promulgated an ordinance respecting the placement of telecommunications towers within county lines.  See Pickens County Ordinances § 66-71, et seq. (hereinafter "Pickens County Tower Ordinance").  The stated purpose of the Pickens County Tower Ordinance is to "establish guidelines for the siting of all wireless, cellular, television and radio telecommunications towers and antennas."  Pickens County Ordinances § 66-72.  Section 66-75 provides several specific "goals" to effectuate that purpose, including, among others, the following:

> To encourage the joint use of new and existing tower sites among service providers;
>
> To locate telecommunications towers and antennas in areas where adverse impacts on the community are minimized;
>
> To encourage the design and construction of towers and antennas to minimize adverse visual impacts; . . . [and]
>
> To protect those geographic areas containing visually significant or unique natural features.

Pickens County Ordinances § 66-75.

Under Georgia law, the specified goals of the Pickens County Tower Ordinance are sufficient to provide the Pickens County Commissioner authority

16

to deny the permit based upon the adverse aesthetic impact of the Tate Historic Area.  In Illusions on Peachtree Street, Inc. v. Young, 257 Ga. 142 (1987), the Georgia Supreme Court rejected a similar challenge to a local government's zoning authority based upon a statute containing a general purpose and specified guidelines.  There, an individual was denied a permit to serve alcohol in a commercial establishment based upon a city ordinance which set forth the general purpose of the alcoholic beverage licencing ordinance and "list[ed] specific factors which serve[d] as a guide to the implementation of the ordinance." Id. at 142.  The mayor denied the permit after considering the listed factors, finding "that the licensing would have a detrimental effect on the surrounding neighborhood because of the close proximity of a school, because of traffic conditions, and because of the residential character of the neighborhood." Id.  Despite the plaintiff's argument that the factors were too vague and non-specific to provide sufficient authority to deny the requested permit, the Georgia Supreme Court held that the statement of the general purpose combined with "specific factors to be considered in effectuating the broad purpose of promoting the general health and welfare of the community" authorized the mayor to deny the permit and were sufficiently detailed to meet

17

the strictures of the Georgia Zoning Procedures Law and constitutional due process.  Id.

In this case, the Commissioner denied SE Towers' application for a tower permit after concluding that the proposed tower would have a material visual impact on the surrounding Tate Historical District.  As Illusion on Peachtree Street makes clear, the Commissioner had the authority to do so based upon the general purpose and specified guidelines provided in Section 66-75 of the Pickens County Tower Ordinance.  Although Section 66-75 characterizes the guidelines to be applied to permit decisions as "goals" as opposed to "factors," in the Court's view, the semantical distinction does not negate the authority contained in Section 66-75 and render its guidance concerning the location of cell towers meaningless and mere surplusage.  To the contrary, Section 66-75 provides specific guidelines to consider in the siting of towers, giving effect to the purpose of the Pickens County Tower Ordinance.  Nor does it conflict with the TCA, because "[n]othing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and . . . aesthetic harmony is a prominent goal underlying almost every such code."  VoiceStream Minneapolis, Inc. v. St. Croix County,

342 F.3d 818, 831 (7th Cir. 2003) (quoting <u>Aegerter v. City of Delafield</u>, 174 F.3d 886, 891 (7th Cir. 1999)).

What is more, notwithstanding SE Towers' argument to the contrary, the Court concludes that the Pickens County Tower Ordinance provided the Commissioner with the additional authority to independently consider SE Towers' compliance with federal regulations prior to issuing the tower permit. Section 66-76 of the Pickens County Tower Ordinance requires that "[a]ll towers must meet or exceed current standards and regulations of the FAA, the FCC, and any other agency of the federal government with the authority to regulate towers and antennae." <u>Id.</u> SE Towers argues that Section 66-76 does not authorize the Commissioner to independently consider whether an application complies with the standards set forth by the FCC. Significantly, however, SE Towers concedes that "the TCA does not preempt the Commissioner from applying any substantive standard set forth in the Tower Ordinance that is not inconsistent with or barred by the TCA" and does not contend that Section 66-76 is superceded by the FCA. Rather, SE Towers offers a narrowing construction of Section 66-76—contending that it authorizes only a denial of a permit based upon *procedural*—and not substantive—non-compliance with FCC rules. (Pls.' Reply at 7 ("The only authority that Section

66-76 gives the Commissioner is the ability to deny an application if an applicant cannot demonstrate that it has complied with the Federal process.").)

The Court finds no support for SE Towers' narrowing construction either in the text of the ordinance or in the provisions of the TCA.  Section 66-76 provides that the application must "meet or exceed *current standards and regulations*" of federal agencies.  Pickens County Ordinances § 66-76.  Its plain language anticipates compliance with *all* standards and regulations of federal agencies—including substantive ones—and offers nothing to suggest that it pertains only to compliance with "the process" of obtaining federal approval.

Moreover, nothing in the TCA nor any other federal law to which the Court has been directed forbids a local government from independently considering compliance with federal law in deciding whether to grant or deny a building permit, particularly where, as here, the local government has before it evidence not considered by the federal agency in rendering its decision.  The TCA indicates that Congress meant preemption to be narrow and preservation of local government rights to be broad.  Spring Spectrum L.P. v. Mills, 283 F.3d 404, 420 (2d Cir. 2002).  It provides that "nothing . . . shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal

20

wireless service facilities," except as explicitly provided in the TCA.  47 U.S.C.

§ 332(c)(7).  No provision in the TCA forbids local governments from

considering compliance with substantive federal regulations in deciding

whether to grant or deny tower permits.  In this case, the Pickens County

Commissioner considered evidence of the balloon test and the independent

testimony of various citizens and community organizations not considered by

the SHPO in its decision not to comment on the proposed permit.  Section 66-

76 granted the Pickens County Commissioner the independent authority to

examine SE Towers' compliance with the FCC rules in light of that evidence.

So long as substantial evidence supported it, the Commissioner was not

forbidden from considering compliance with federal regulations in rendering his

decision.

Accordingly, the Court concludes that, despite SE Towers' argument to

the contrary, the Commissioner had two sources of authority—Section 66-75

and Section 66-76 of the Pickens County Tower Ordinance— to deny the

permit based upon his finding that the proposed cell tower had a materially

adverse visual impact on the Tate Historic District.

**C.    The Denial Was Based on Substantial Evidence.**

In its second point of argument, SE Towers contends that it submitted

voluminous evidence in support of its Application, and that the Commissioner,

acting in contravention to that great weight of evidence, elected to deny SE

Towers' Application without substantial supporting evidence.  According to SE

Towers, it demonstrated to the Commissioner that the proposed tower would

not have a materially adverse visual impact on the Historic Area and that the

proposal was the only legally and technologically viable alternative available to

close the undisputed coverage gap.  The Commissioner, on the other hand,

maintains that his decision was supported by substantial evidence that SE

Towers' proposed tower would have a materially adverse visual impact on the

scenery and aesthetics of the Tate Historic District.

The Eleventh Circuit, in accord with apparently all courts of appeals

which have addressed the issue, has determined that aesthetics may constitute a

valid basis for denial of a wireless permit if substantial evidence of the visual

impact of the tower was before the zoning decisionmaker.  Preffered Sites, 296

F.3d at 1219-20.  ("Aesthetic concerns may be a valid basis for denial of a

permit *if* substantial evidence of the visual impact of the tower is before the

board." (emphasis in original)); Michael Linet, Inc., 408 F.3d at 761-62

(holding that residents' and realtor's testimony concerning the cell site's

negative impact on real estate values and proximity to local middle school was

substantial evidence and noting plaintiff "failed to show that an alternative location was unavailable or unfeasible").  Citizens' generalized concerns about aesthetics, however, are insufficient to constitute substantial evidence.  Id.  Because "[f]ew people would argue that telecommunications towers are aesthetically pleasing," a local zoning board's "aesthetic judgment must be grounded in the specifics of the case."  Todd, 244 F.3d at 61.

Although some of the comments voiced by the citizens who testified at the public hearing before the Planning Commission consisted of general statements that the tower was an eyesore and would generally have a negative impact on mountain views, most of the concerns about aesthetics were focused on the incompatibility of a 250-foot tower with the scenery of the Tate Historic District and the direct line-of-site views of the cell tower from at least six structures within the Historic District.  In particular, the Marble Valley Historical Society, the Marble Valley Friends, Inc., the State Community Association, and the Citizens Advocating Responsible Development voiced strong opposition to the tower, asserting that the unspoiled view of the Tate Historic District was a unique historical resource that deserved special protection.  These organizations supported their position with photographs taken during the balloon test that showed that a 250-foot cell tower on the

Property would be visible from various locations within the Tate Historic

District.  Moreover, several individuals expressed a preference for a less

intrusive tower design that would have less of an adverse impact on the

aesthetic appeal of the Tate Historic District.

 Although SE Towers presented evidence to the contrary, and strenuously

contended that any views of the cell tower would not be materially adverse to

the characteristics of the Historic District, the Court cannot conclude that the

Commissioner's resolution of the dispute against SE Towers was not based

upon substantial evidence.  Based on the evidence in the record of the specific

effect the placement of the cell tower would have on the Tate Historic District,

the Court concludes that the Commissioner's determination that the proposed

tower would adversely impact the aesthetic harmony of the Tate Historic

District was "grounded in the specifics of the case."  <u>Todd</u>, 244 F.3d at 61.  The

decision was not based upon merely general objections to the aesthetic appeal

of a telecommunications tower; rather, photographs and specific supporting

testimony demonstrated that the proposed tower would have a specific and

material impact on the landscape and buildings within the Historic District.

Based on this evidence, the Commissioner's decision did not violate the

substantial evidence requirement of § 332(c)(7)(B)(iii).

AO 72A
(Rev.8/82)

In sum, it is SE Towers' burden to establish that the Commissioner's decision was not supported by substantial evidence.  It has failed to satisfy that burden.  Despite SE Towers' assertion, substantial and specific evidence was presented to the Commissioner upon which he could have based his denial of a permit for SE Towers' proposed tower based on aesthetic considerations and the impact of the proposed cell tower on the surrounding Tate Historical Area. On this record, SE Towers' Appeal must be denied.

## Conclusion

For the reasons stated herein, Plaintiffs' Appeal [15] is **DENIED**.

**SO ORDERED** this   12th   day of May, 2008.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

25